COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

JESSE JOHN BARRIENTES, III,                         )

                                                                              )               No.  08-02-00113-CR

Appellant,                          )

                                                                              )                    Appeal from the

v.                                                                           )

                                                                              )                
106th District Court

THE STATE OF TEXAS,                                     )

                                                                              )            
of Gaines County, Texas

Appellee.                           )

                                                                              )                    (TC# 01-3112)

                                                                              )

 

 

O
P I N I O N

 

Appellant Jesse
John Barrientes, III appeals his conviction for the
offense of engaging in organized criminal activity.  After finding Appellant guilty, the jury made
an affirmative finding that Appellant used or exhibited a deadly weapon during
the commission of the offense.  The jury
assessed punishment and Appellant was sentenced to 18 years= imprisonment in the Institutional
Division of the Texas Department of Criminal Justice and fined $5,000.  Appellant raises two issues on appeal:  (1) the evidence is legally and factually
insufficient to support his conviction for engaging in organized criminal
activity because the State failed to prove he acted with intent to establish,
maintain, or participate in a combination; and (2) the conviction was based on
uncorroborated accomplice witness testimony. 
We affirm.








This case involves
a drive-by shooting of a family residence that occurred on February 5, 2000 in
Seminole, Texas.  On that day, Marvin Ensor and his daughter returned home from a trip to Fort
Worth shortly after five o=clock
in the evening.  Ten to twenty minutes
later, Mr. Ensor was sitting in his living room when
he heard loud noises out in front of his house that sounded like gunfire.  Mr. Ensor went out
to investigate and saw that his work pickup truck, which was parked in front of
his house, had bullet holes down the side of it and its back passenger side
window was broken.  Janet Smith, a
neighbor whose daughter was playing at the Ensor
residence, came towards him from across the street to talk to him about what
had happened.

Ms. Smith
testified that she had been sitting in her dining room with a friend when she
heard some loud bangs or popping sounds. 
She immediately ran to the screen door to see what had caused the
noise.  Ms. Smith went outside and saw a
dark sporty car peeling out at the stop sign and speed around the corner.  To Ms. Smith, the car seemed to be full of
people.  Ms. Smith talked to Mr. Ensor, observed the damage done to Mr. Ensor=s pickup truck, then went back to her
house and called 911 for police assistance. 
Police officers later determined that Mr. Ensor=s work vehicle had been struck five
times by gunfire.

Police officers
and Mr. Ensor then discovered that three bullets went
through the daughter=s
bedroom window, located just east of the front door, and a fourth bullet had
ricocheted off the window frame.  One of
the bullets went through two panes of glass and traveled through mini blinds, a
curtain, through the bedroom, and an open door before it became lodged between
two walls in the hallway.  Police
officers recovered a bullet lodged in the window frame and a bullet fragment on
the front porch below the bedroom window. 
Officers at the scene also recovered numerous .25 and .22 caliber shell
casings from the road in front of the Ensor
residence.








Texas State
Trooper Juan Gabriel Medrano was on highway patrol duty on the evening of
February 5, 2000.  Around 5:30 p.m.,
Trooper Medrano was advised by dispatch that there had been a drive-by shooting
in Seminole and was given a description of the suspect=s
vehicle as Aan early
model dark blue Camaro with a spoiler on the trunk.@ 
Trooper Medrano waited on Highway 385 which heads toward Odessa, for
approximately twenty minutes before proceeding back to Seminole.  As he drove, Trooper Medrano noticed a dark
green Saturn with a spoiler on the trunk. 
As Trooper Medrano looked over at the vehicle, all four occupants looked
over at him at the same time, which he thought was a little odd.  As Trooper Medrano followed the vehicle, he
observed that the right rear passenger had on a black and white rag and turned
around to look at him.  The left rear
passenger had on a red hat with a red bandana and a red shirt.  Trooper Medrano also noticed a lot of
movement inside the vehicle.  Based on
his training and experience, the clothing on the left rear passenger indicated
to Trooper Medrano that the individual was a gang member of the Bloods.  Suspecting that the vehicle may have been
involved in the drive-by shooting, Trooper Medrano called for back-up and
proceeded to follow the vehicle to a residence on County Road 406.








Trooper Medrano
pulled into the residence driveway as the four occupants of the vehicle quickly
got out and headed towards the house without looking at the officer, even
though they had seen the trooper following them.  Trooper Medrano called them over to talk and
smelled an odor of alcohol from the group. 
The individuals were later identified as Dante Canava,
the driver, Anthony Savage, the front right passenger, Felipe Castillo, the
left rear passenger, and Appellant, the right rear passenger in the
vehicle.  Trooper Medrano did not search
the vehicle, but through a window he saw a pair of black gloves, a knife in the
driver=s side
door bin, and two boxes of Remington .22 caliber ammunition in the mesh holder
behind the driver=s seat.

Patrol Lieutenant
Ronny Pipkin of the Seminole Police Department
searched the vehicle and recovered the following evidence:  two boxes of .22 caliber ammunition behind
the driver=s seat in
a net pouch; one box of .25 caliber ammunition in the back seat on the
passenger=s side; a
butcher=s knife
in the driver=s side
door pouch; a .25 caliber Ravens Arms handgun and a .22 Colt handgun in the
back seat area hidden underneath the plastic console between the seats; two
magazine clips in the glove compartment, one containing ten rounds of .22
caliber bullets and the other containing six rounds of .25 caliber bullets; and
a pair of black leather gloves in the back seat area on the passenger
floorboard.

Anthony Savage,
one of the passengers in the vehicle testified about the events related to the
drive-by shooting.  According to Savage
on February 5, 2000, he was visiting with his girlfriend at her mother=s house when Canava,
Castillo, and Appellant drove up in a two-door green Saturn and picked him
up.  Appellant asked Savage if he could
help Appellant=s mom
move some furniture.  Canava
was driving, Savage was in the front passenger seat, Appellant was in the right
rear seat and Castillo was in the left rear seat.  They went to Savage=s
mother=s house
so that he could tell her that he was going to Seminole to help Appellant=s mother move and they stopped at an Allsup=s
store for cigarettes and orange juice. 
When they reached the city limits, Savage noticed that Castillo had a
black pistol inside the front of his pants. 
Savage asked Castillo what he was doing and Appellant then told Savage
that they had two of them, showing Savage another pistol.  Castillo then told Savage that Aif anybody messes with them that they was going to bust on them,@
meaning they were going to shoot them. 
They then drove to the 








Wal-Mart, where
Appellant and Castillo bought three boxes of ammunition in the sporting goods
section.

After they left
the Wal-Mart, Appellant gave Canava driving
directions first to his mother=s
house where they helped move boxes and then to his grandmother=s house.  On the way to his grandmother=s house, Appellant asked if anybody
wanted to go to the country and shoot the guns. 
On their way back from his grandmother=s
house, Appellant said they were going back to his mother=s
house and started giving driving directions again.  At that point, Savage observed Appellant and
Castillo load and then switch the guns.  Before loading the guns, Appellant put on a
white bandana and Castillo put on a red bandana.  They were driving in a residential
neighborhood.  Castillo then put a gun in
Canava=s
seat and said, ADante,
there it is.@  Canava said, AForget it.@  Appellant then pushed Savage=s seat up,
went out the window, and he and Canava started firing
shots at a residence.  Savage asked Canava if he had shot at the house and Canava
laughed in reply.  Savage told Canava that was the reason he had got out of the
gangs.  After the shooting, they turned
the corner driving fast.  They went to Allsup=s
and were heading to the highway when they saw a DPS officer on the side of the
road.  The officer began following them
and Appellant and Castillo started wiping down the guns with their
bandanas.  They tried to hide the guns
and Canava put the clips in the glove
compartment.  Appellant told Canava to pull into his grandmother=s
house.  When they exited the vehicle they
were questioned by the officer and the vehicle was later searched.








Savage testified
that he is a former member of the West Side Bloods.  He also stated that Castillo is a Bloods gang
member and Canava is a member of the Latin King Blood
Nation gang.  On cross-examination,
Savage recalled that there was no discussion about going out and shooting a
house and that it came as a surprise. 
Savage also stated that Appellant is not a gang member and that he,
Savage, was wearing certain gang-associated colors that day because he did not
have anything else to wear.

Kim Ogg, former director of the Houston Mayor=s Office Gang Task Force, testified for
the State as an expert witness on criminal street gangs and gang violence.  Ms. Ogg explained
the initiation process of many gangs. 
Committing a criminal offense is a common type of gang initiation.  In this initiation process members are often
required to commit a random act against an innocent stranger.  Ms. Ogg stated that
the Bloods are a criminal street gang whose members continuously associate in
the commission of criminal activities. 
There are identifiable signs and symbols used by the Bloods and the
Latin Kings, an affiliation group that is often synonymous with the
Bloods.  Wearing the color red is an
overt symbol used by the Bloods, while Latin Kings utilize the crown, a
five-pointed star, and hand signs reflecting a crown.  Latin Kings use color sometimes.  They will often use red and sometimes royalty
colors like gold, purple, and green.

In Ms. Ogg=s
opinion from Canava=s
clothing at the time of the shooting, his crown ring, and king tattoo, she
identified Canava as a member of the Latin King Blood
Nation.  Ms. Ogg
identified Castillo as a member of the East Side Bloods by the clothing he was
wearing and his tattoos.  In Ms. Ogg=s
opinion, Appellant is a member of the Bloods because police had reasonable
suspicion to believe that he had been involved in criminal activity, he
frequents documented areas of criminal street gangs, he associates with known
criminal street gang members, he uses criminal street gang dress, and he was
arrested or taken into custody with known criminal street gang members.








At trial,
Appellant testified that on February 5, 2000, he was living with his girlfriend
at his mother=s
apartment in Seminole, but moving to Andrews to be closer to his work at a
vacuum company.  That day, Appellant had
made arrangements with a cousin to help move his girlfriend=s stuff from her family=s home in Hobbs and some of his stuff
over to Andrews.  When his cousin did not
show up, Appellant=s
girlfriend dropped him off at his friend Pete Quiroz=s
house.  Appellant was looking for
somebody to help him move.  Felipe
Castillo, Appellant=s cousin,
was at the house.  An hour to two hours
later, Canava and Savage showed up.  Castillo volunteered to help Appellant
move.  Canava
was planning to go to Odessa and Appellant wanted Canava
to drop him and Castillo off in Andrews. 
Appellant admitted that he had his gun, a .22 caliber Colt handgun, with
him at the time.  Appellant explained
that he did not want to leave the gun in his girlfriend=s
car because he was concerned about her little brother finding it.  Appellant asked Canava
for a ride over to Seminole because his girlfriend was going to go there to
load some more stuff for the move.

Appellant recalled
that as they headed toward Seminole to Appellant=s
mother=s house,
Savage asked him about his gun and asked to see it.  Appellant handed the gun to him.  Castillo also had a gun.  Appellant and his companions were at his
mother=s house
for about thirty minutes, loading his girlfriend=s
car with their stuff.  Afterwards, they
went to Wal-Mart where Castillo bought shells for the weapons.  According to Appellant, Canava
and Savage wanted to shoot the guns and he had told them, AWell, we can
go out there in the country and shoot.@








After leaving the
Wal‑Mart, Appellant decided to go by his father=s
house because his father has a truck. 
Savage loaded the magazines for the guns.  Canava was driving
and Savage was sitting in the front passenger seat.  At some point, Canava
asked Castillo for his gun.  Appellant
recalled that Canava said, AF‑‑‑
it@ and then Canava
and Savage started shooting at the same time. 
Appellant had no idea this was going to occur.  When Appellant asked why they did it, they
just laughed in reply.  Canava took off and Appellant told him to go to the Allsup=s
for gas and to go to Andrews.  They were
stopped by the police soon after. 
Appellant conceded that he knew his cousin Castillo was a gang member,
but he denied being a gang member himself, denied hanging out with Castillo and
other Blood members, and denied firing a weapon at the Ensor
residence.

The State called
two rebuttal witnesses, Roy Powers and Detective Stan Durham.  Roy Powers has known
Appellant since the eighth grade and they used to run around together six years
ago.  Mr. Powers recalled Appellant
telling him a few times that he was not afraid to bust a cap in someone.  Appellant also bragged about his homeboys
doing drive‑bys, particularly one on a hotel in Hobbs.  Mr. Powers also saw Appellant carrying a red
bandana, which he kept in his front pocket. 
Detective Stan Durham of the Hobbs Police Department testified that on
different occasions he has seen Appellant at 210 North McKinley, an area in
town associated with the East Side Bloods. 
Detective Durham has seen Appellant in the company of known Blood
members, Castillo and several different Blood gang members.  Detective Durham recalled that on one
occasion he saw Appellant Aflying
his colors,@
that is, symbolizing that a person associates with a certain gang.  On that occasion, he saw a red flag on the
rearview mirror in Appellant=s
vehicle.

Sufficiency
of the Evidence

In Issue One,
Appellant argues the evidence is legally and factually insufficient to support
his conviction for engaging in organized activity because the State failed to
prove he acted with intent to establish, maintain, or participate in a
combination.








In conducting a
legal sufficiency review, we examine all the evidence in a light most favorable
to the verdict to determine whether any rational trier
of fact could have found the essential elements of the offense beyond a
reasonable doubt.  Jackson
v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781,
2788-89, 61 L.Ed.2d 560, 573 (1979); Lacour
v. State, 8 S.W.3d 670, 671 (Tex.Crim.App. 2000).  We do not resolve any conflict of fact, weigh
any evidence, or evaluate the credibility of any witnesses, as this was the
function of the trier of fact.  See Alvarado v. State, 912
S.W.2d 199, 207 (Tex.Crim.App. 1995); Adelman v. State, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992). 
Rather, our duty is to determine if both the explicit and implicit
findings of the trier of fact are rational by viewing
all the evidence admitted at trial in the light most favorable to the
verdict.  See Adelman, 828 S.W.2d at 421-22; Menchaca
v. State, 901 S.W.2d 640, 650 (Tex.App.--El Paso
1995, pet. ref=d).  In so doing, any inconsistencies in the evidence
are resolved in favor of the verdict.  See
Matson v. State, 819 S.W.2d 839, 843 (Tex.Crim.App.
1991); Menchaca, 901 S.W.2d at 651.








In reviewing a
factual sufficiency challenge, we view all of the evidence in a neutral light,
both for and against the verdict, to determine whether it demonstrates that the
proof of guilt is so obviously weak as to undermine our confidence in the jury=s determination, or the proof of guilt,
although adequate if taken alone, is greatly outweighed by contrary proof.  Johnson v. State, 23
S.W.3d 1, 11 (Tex.Crim.App. 2000); Clewis v. State, 922 S.W.2d 126, 134 (Tex.Crim.App. 1996). 
We review the evidence supporting a disputed fact and compare it to
evidence tending to disprove that fact.  Johnson,
23 S.W.3d at 6-7; Jones v. State, 944 S.W.2d 642, 647 (Tex.Crim.App. 1996), cert. denied, 522 U.S. 832, 118
S.Ct. 100, 139 L.Ed.2d 54 (1997).  While authorized to disagree with the jury=s determination, we must give due
deference to the jury=s
assessment of the weight and credibility of the evidence to avoid substituting
our judgment for that of the fact finder. 
Johnson, 23 S.W.3d at 8-9; Jones,
944 S.W.2d at 648.  We will set aside a
verdict only where the evidence supporting guilt is so obviously weak or the
contrary evidence so overwhelmingly outweighs the supporting evidence as to
render the conviction clearly wrong and manifestly unjust.  Ortiz v. State, 93 S.W.3d 79, 87 (Tex.Crim.App. 2002), cert. denied, 123 S.Ct. 1901, 155 L.Ed.2d 824 (2003).

Engaging
in Organized Criminal Activity

Appellant was
charged by indictment with the offense of engaging in organized criminal
activity.  Section 71.02 of the Texas
Penal Code provides:

(a)        A person commits an offense [of engaging
in organized criminal activity] if, with the intent to establish, maintain, or
participate in a combination or in the profits of a combination or as a member
of a criminal street gang, he commits or conspires to commit one or more of the
following:

 

(1)        murder, capital murder, arson,
aggravated robbery, robbery, burglary, theft, aggravated kidnapping,
kidnapping, aggravated assault, aggravated sexual assault, sexual assault,
forgery, deadly conduct, assault punishable as a Class A misdemeanor, burglary
of a motor vehicle, or unauthorized use of a motor vehicle . . . .

 

Tex.Pen.Code Ann. '
71.02(a)(1)(Vernon Supp. 2004).

The underlying offense in this case
was deadly conduct.[1]  See Tex.Pen.Code Ann. '
22.05 (Vernon 2003).  Section 71.01
defines Acombination@ as Athree
or more persons who collaborate in carrying on criminal activities . . . .@ 
See Tex.Pen.Code Ann. '
71.01(a).  A Acriminal
street gang@ is
defined as Athree or
more persons having a common identifying sign or symbol or an identifiable
leadership who continuously or regularly associate in the commission of
criminal activities.@  See Tex.Pen.Code Ann. '
71.01(d).








Appellant contends
that the State failed to prove he acted with intent to establish, maintain, or
participate in  a
Acombination.@  The court=s
charge to the jury, however, presented the State=s
two alternative theories of engaging in organized criminal activity as alleged
in the indictment--that Appellant either committed the
engaging offense by committing deadly conduct with the intent to participate in
a combination with the named individuals or as a member of a criminal street
gang.  Based on the charge submitted to
the jury, the State need only have sufficiently proven one of the alternative
theories of the alleged offense.  In
reply, Appellant argues that the State failed to meet its burden with respect
to the alternative theory that Appellant committed the offense as a member of a
criminal street gang as well.  We observe
that in his brief, Appellant only challenged the State=s
criminal street gang member theory indirectly by his assertion that there was
no proof offered that he was a gang member. 
In the interest of justice, however, we will entertain Appellant=s complaint as a challenge to legal
sufficiency of the Acriminal
street gang@ element
of the engaging offense.








Two witnesses
testified that Appellant was a member of the Bloods because he met the
identifying criteria of a Blood gang member. 
Kim Ogg informed the jury that the Bloods are
a criminal street gang whose members continuously associate in the commission of
criminal activities.  The Bloods and the
Latin Kings, their affiliate gang, have identifiable signs and symbols that
mark an individual=s
membership in the gang.  Ms. Ogg identified Canava, Savage,
and Castillo as members of the Bloods and its affiliate, the Latin Kings.  In Ms. Ogg=s opinion, Appellant meets the criteria
for identification as a Blood gang member because he was involved in criminal
activity, frequents documented areas of gangs, associates with known gang members, he uses gang dress, and was arrested or taken into
custody with known criminal street gang members.  According to Detective Durham, Appellant fits
the criteria of membership in the Bloods. 
On different occasions, Appellant was seen in documented areas
associated with the East Side Bloods gang and in the company of known Blood
members.  On one occasion, Detective
Durham saw Appellant displaying an identifiable symbol associated with the
Bloods gang.  We find there was
sufficient evidence from which the jury could rationally conclude that
Appellant intended to participate in the offense of deadly conduct as a member
of a criminal street gang under the engaging statute.  After reviewing all the evidence, we also
conclude that it was factually sufficient to sustain Appellant=s conviction as the evidence supporting
guilt is not so obviously weak nor overwhelmingly
outweighed by contrary evidence as to render the conviction clearly wrong and
manifestly unjust.  See Ortiz, 93 S.W.3d at 87. 
Issue One is overruled.

Accomplice
Witness Testimony

In Issue Two,
Appellant asserts the accomplice witness testimony offered by Anthony Savage
was not corroborated by other evidence. 
Specifically, Appellant contends that excluding Savage=s testimony, the only other evidence
connecting him to the offense of deadly conduct was his presence in the vehicle
and his ownership of one of the firearms.








It is undisputed
that Savage was an accomplice as a matter of law.  Under Article 38.14 of the Texas Code of
Criminal Procedure, a conviction cannot stand on accomplice testimony unless it
is corroborated by other evidence tending to connect the defendant with the
offense; the evidence is insufficient if it proves merely the commission of the
offense.  See Tex.Code Crim.Proc.Ann. art.
38.14 (Vernon 1979); Cathey v. State,
992 S.W.2d 460, 462 (Tex.Crim.App. 1999), cert.
denied, 528 U.S. 1082, 120 S.Ct 805, 145 L.Ed.2d
678 (2000).  In reviewing the sufficiency
of the corroborating evidence, this Court must eliminate the accomplice
testimony from consideration and then examine the remaining evidence to
determine whether there is other evidence that tends to connect the accused
with the commission of the crime.  Solomon
v. State, 49 S.W.3d 356, 361 (Tex.Crim.App.
2001); McDuff v. State, 939 S.W.2d 607,
612 (Tex.Crim.App.), cert. denied, 522 U.S.
844, 118 S.Ct. 125, 139 L.Ed.2d 75 (1997).  It is not necessary that the corroborating
evidence directly connect the defendant to the crime or that it be sufficient
by itself to establish the defendant=s
guilt; it need only tend to connect the defendant to the offense.  See Cathey,
992 S.W.2d at 462; Cox v. State, 830 S.W.2d 609, 611 (Tex.Crim.App. 1992).

Mere presence of a
defendant at the scene of the crime is insufficient to corroborate accomplice
witness testimony.  See Cox, 830 S.W.2d at 611. 
However, evidence of the defendant=s
presence at the scene, coupled with other suspicious circumstances, even
seemingly insignificant ones, may well be enough to connect the defendant to
the offense.  Dowthitt v. State,
931 S.W.2d 244, 249 (Tex.Crim.App. 1996).  Evidence that the defendant was in the
presence of the accomplice at or near the time or place of the offense is
proper corroborating evidence.  McDuff, 939 S.W.2d at 613.  All facts and circumstances in evidence may
be looked at to determine whether an accomplice=s
testimony is corroborated.  Munoz v. State, 853 S.W.2d 558, 560 (Tex.Crim.App.
1993).  If the combined weight of
the non-accomplice evidence tends to connect the defendant to the offense, the
requirement of Article 38.14 has been fulfilled.  Gosch v.
State, 829 S.W.2d 775, 777 (Tex.Crim.App. 1991), cert.
denied, 509 U.S. 922, 113 S.Ct. 3035, 125 L.Ed.2d
722 (1993).








In this case,
there is sufficient non-accomplice evidence that tends to connect Appellant to
the offense.  Savage testified that while
driving through a residential neighborhood in Seminole, Appellant and Canava started shooting at a residence.  Janet Smith, a neighborhood resident,
testified that after hearing loud bangs, she saw a sporty vehicle filled with
people speed away from the scene. 
Trooper Medrano corroborated Savage=s
testimony as to where each passenger was seated in the vehicle and Appellant=s presence with codefendants following
the drive-by shooting.  The State also
introduced into evidence testimony by Daniel Alaniz,
the 

Wal-Mart employee who sold Castillo
and Appellant the ammunition later recovered from the vehicle.  Mr. Alaniz
corroborated Savage=s
testimony that Appellant and codefendants went to Wal-Mart on February 5, 2000
and obtained the .22 and .25 caliber bullets later used in the shooting.  Moreover, Appellant=s
own testimony corroborated Savage=s
testimony.  In his testimony, Appellant
recalled similar prior events, including certain moving activities, the 

Wal-Mart trip,
and the giving of driving directions through the Seminole neighborhood.  We conclude the State met its burden under
Article 38.14.  See Cathey, 992 S.W.2d at 463.  Issue Two is overruled.

We affirm the
trial court=s
judgment.

 

November 20, 2003

DAVID WELLINGTON CHEW, Justice

 

Before Panel No. 1

Larsen, McClure, and Chew, JJ.

 

(Do Not Publish)











[1]
A person commits deadly conduct if he or she knowingly discharges a firearm at
or in the direction of:  (1) one or more
individuals; or (2) a habitation, building, or vehicle and is reckless as to
whether the habitation, building, or vehicle is occupied.  See Tex.Pen.Code Ann. '
22.05(b)(Vernon 2003).